# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| VICTORIA HOUSE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 13 C 5664 |
| v. | ) |
| | ) Judge George M. Marovich |
| S&C ELECTRIC COMPANY, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Victoria House was discharged from her job with defendant S&C Electric Company after defendant learned that she had been involved in an altercation in which her husband was stabbed by a knife House was holding. House filed suit alleging that she was discharged on the basis of her sex and race, in violation of Title VII of the Civil Rights Act of 1964. Defendant has filed a motion for summary judgment. For the reasons set forth below, the Court grants defendant's motion for summary judgment.

## I. Background

Local Rule 56.1 outlines the requirements for the introduction of facts parties would like considered in connection with a motion for summary judgment. The Court enforces Local Rule 56.1 strictly. Facts that are argued but do not conform with the rule are not considered by the Court. For example, facts included in a party's brief but not in its statement of facts are not considered by the Court because to do so would rob the other party of the opportunity to show that such facts are disputed. Where one party supports a fact with admissible evidence and the other party fails to controvert the fact *with citation to admissible evidence*, the Court deems the fact admitted. *See Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 817-818 (7th Cir. 2004). This does not, however, absolve the party putting forth the fact of its duty to support the

fact with admissible evidence. *See Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012). Asserted "facts" not supported by specific pages of deposition testimony, documents, affidavits or other evidence admissible for summary judgment purposes are not considered by the Court.

The following facts are undisputed unless otherwise noted.

Defendant S&C Electric Company ("S&C") designs and manufactures equipment (such as switches) for the transmission and distribution of electricity. During the relevant time period, S&C employed more than 1500 people, including both plaintiff Victoria House ("House") and her husband Dennis Vandergriff ("Vandergriff"). House is a member of two categories protected by Title VII: she is female, and she is African-American. Vandergriff falls outside of both of House's protected classes.

House was a minority at S&C. As of 2011, S&C employed only 39 African-American women. Back in 2000, S&C began an affirmative action plan to recruit women to nontraditional roles, including jobs in its internal maintenance department, which it calls "Department 914." S&C recruited House in November 2000. House was the first woman hired after the start of the affirmative action program.

The person who interviewed and hired House was Dennis Hattan ("Hattan"), S&C's Director of Production, Equipment Standards, Engineering and Maintenance. Hattan was in charge of Department 914, and he supervised the individuals who supervised House directly.

House's first job title was Mechanic C-Machine Tool in Department 914. The title of the position (but not its duties) changed to Technician B-Production Equipment in March 2002. House's job was to maintain, repair, troubleshoot and adjust S&C's production equipment. In House's first year, defendant rated House's performance "Needs Improvement." In 2003, defendant rated House's performance "Satisfactory." Defendant rated House's performance

"Very Good" for the years 2004, 2005, 2006, 2008, 2009 and 2010. That is not to say that House's performance was flawless during those years. During those years, S&C gave House four corrective actions, notified her of five roadway safety and parking violations and counseled her for failing to keep her midriff covered.

In December 2011, S&C put House on what is essentially a last-chance agreement. The investigation leading thereto was triggered on November 5, 2011, when House drove her vehicle into the main gate of S&C's entrance. When it investigated the crash, S&C learned that House had been absent from work for more than an hour (her lunch break was supposed to be 30 minutes) without the permission of her supervisor. S&C then checked records from October and November 2011 and learned that, on six occasions, House had returned to S&C after her scheduled lunch break had ended, all without the permission of her supervisor. This prompted S&C to check records for the entire year, at which point S&C discovered that House had returned to S&C from lunch late, without permission, on 30 occasions.

House had other performance issues in November 2011. On November 11, 2011, House was late to a mandatory safety meeting. On November 14, 2011, House was late (by 45 minutes) to a mandatory pension meeting. On November 18, 2011, House was counseled for wearing inappropriate attire. (This was not the first time House was counseled for not keeping her midriff covered with cotton fabric at work.) On November 21, 2012, House arrived to work an hour late.

On December 22, 2012, Hattan and House's supervisor met with House to inform her that it was giving her a Decision-Making Day Corrective Action. At S&C, a Decision-Making Day Corrective Action is the most-serious step in its employee performance correction policy. When S&C issues an employee a Decision-Making Day Corrective Action, it informs the employee of the areas in which he or she is failing to meet S&C's expectations and gives the

employee the following day off (with pay) to decide whether he or she prefers: (a) to quit; or (b) to make a firm commitment to meet S&C's expectations. If an employee chooses to remain an employee, then the Decision-Making Day remains active for a year, which is to say that if the employee fails to meet S&C's expectations during the year, he or she may be discharged. When Hattan and House's supervisor met with House on December 20, 2012, they informed House that she had failed to meet S&C's expectations with respect to attendance, punctuality and by taking excessive lunch breaks. They told House to take December 21, 2012 off from work (with pay) to decide whether she wanted to quit or return to work. When she returned on December 22, 2012, House informed Hattan and her supervisor that she wanted to return to work.

The next six or so weeks passed without incident. S&C was closed for its annual holiday shutdown from December 23, 2011 to January 2, 2012. Employees (including House) were paid for that time period. From January 2, 2012 until February 2, 2012, House was not counseled for any problems at work. February 2, 2012 was the first day of a disability leave that House took on account of an off-duty injury. (The parties do not say what the injury was or for what period of time House was expected to be out of work.)

On the morning of February 2, 2012, House and her husband Vandergriff got into an argument. The details are not clear, but it is clear that Vandergriff ended up with stab wounds and that House was holding the knife that wounded him. House has put forth disputed evidence that Vandergriff hit her and knocked her onto a countertop. It is undisputed that Vandergriff left the house (he went into the garage) and that House called the police. When the police arrived, House told Officer Janet Jones that she had cut Vandergriff with a knife. House also told the police that Vandergriff had been beating her. The Skokie Police handcuffed House, gave her *Miranda* warnings and kept her in custody for about 36 hours.

In the meantime, the Skokie Police called Daniel Soesbe ("Soesbe"), House's supervisor at S&C. The police informed Soesbe that Vandergriff and House had been in an altercation and that Vandergriff was hospitalized. Shortly thereafter, House called Soesbe and told him she had swung a knife at Vandergriff, who was injured. Eventually, the Skokie Police released House without charges.

S&C immediately began an investigation. S&C told both Vandergriff and House that they could not return to work until they met (individually) with Hattan to discuss their altercation. S&C asked them both to provide any documentation they possessed related to the incident.

Vandergriff complied first. In late February 2012, Hattan and Vandergriff met. Vandergriff provided his medical records, which reflected that he had been stabbed and suffered injury that required surgery to repair. Vandergriff also provided a copy of the police report and a copy of his order of protection against House that had been entered on February 8, 2012 by the Circuit Court of Cook County. Vandergriff also informed Hattan that, at some point in the future, he would have to serve prison time for having driven under the influence of alcohol on multiple occasions, most recently in April 2011.

House met with Hattan on March 2, 2012. During the meeting, House told Hattan that she did not know that Vandergriff had been cut during the incident. House also stated that she was a victim of abuse and had acted in self-defense. House stated that she had been the one who called police and that she had no pending charges against her. In addition to describing the February 2, 2012 incident, House also provided S&C with documents reflecting Vandergriff's prior arrests, including three for driving under the influence of alcohol. House told Hattan that Vandergriff was likely to serve time in jail.

After reviewing the documents provided by Vandergriff and House and interviewing them both, Hattan concluded that House's account of the February 2, 2012 incident was not credible. Hattan concluded that House's statements during the March 2, 2012 meeting were inconsistent with what she had told Soesbe on February 2, 2012, with Vandergriff's medical records and with the Skokie Police report. Specifically, House told Hattan that she was not aware that Vandergriff had been injured, but a month earlier House: (a) told Soesbe that she had swung a knife at Vandergriff, who was injured; and (b) told Officer Jones she had cut Vandergriff with a knife.

On March 13, 2012, S&C terminated House's employment for engaging in "conduct unbecoming an S&Cer" less than two months after being issued a Decision-Making Day Corrective Action. S&C's Employee Performance Policy defines "conduct unbecoming an S&Cer" as "on-premises or off-premises conduct that reflects unfavorably on the employee or on S&C, including immoral or indecent behavior, and taking into consideration such factors as the nature of any charge made against the employee, the circumstances of any arrest, the employee's work record, and the impact of the situation on the company's business or reputation." At their depositions, various S&C management employees had difficulty articulating specific examples of "conduct unbecoming an S&Cer."

Although Hattan had the authority to discharge both House and Vandergriff, Hattan did not discharge Vandergriff. Vandergriff's doctors released him to return at work on March 28, 2012, at which point S&C granted him four additional weeks of short-term disability leave so that he could attend an in-patient substance abuse program. About two months later, on June 6, 2012, Vandergriff resigned his position at S&C, apparently due to his impeding prison term, which had resulted from his decision to drive under the influence of alcohol in April 2011.

S&C had previously terminated an employee for "conduct unbecoming an S&Cer" after the S&C employee had been convicted of driving under the influence of alcohol six months after having been given a final warning by S&C.

## II.     Summary Judgment Standard

Summary judgment shall be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). When making such a determination, the Court must construe the evidence and make all reasonable inferences in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Summary judgment is appropriate, however, when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005).

## III.    Discussion

Federal courts are not super-personnel departments that review the employment decisions of private employers. Employers are generally free to discipline or fire employees for any reason or no reason, but they cannot discipline or discharge employees for reasons that are unlawful. For example, Title VII makes it unlawful to fire an employee due to sex or race (among other things), and, in this case, House claims she was discharged due to her sex and race. Pursuant to Title VII of the Civil Rights Act of 1964, it "shall be an unlawful employment practice for an employer–(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or

privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).

Title VII does not, by its terms, prohibit an employer from discharging an employee because she engaged in a domestic dispute outside of work.  What Title VII does prohibit, however, is discharging only women who engage in domestic disputes outside of work while not discharging similarly-situated men who engage in domestic disputes outside of work.  That is so, because disparate treatment in employment on the basis of sex violates Title VII.  The question in this case is not whether House was the victim or the aggressor in her domestic dispute.  It is not whether S&C was correct in believing Vandergriff's story over House's.  It is not whether discharge is too harsh a penalty for engagement in a domestic dispute.  The question is whether House has put forth sufficient evidence from which a reasonable jury could conclude that S&C discharged her due to her sex and/or her race.

In this case, House has not put forth any direct evidence that S&C discharged her due to her race or sex.  House can still survive a motion for summary judgment using the indirect method of showing unlawful discrimination.  To do so, she must first make out a *prima facie* case of discrimination, by putting forth evidence that: (1) she is a member of a protected class; (2) she was meeting the employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) a similarly-situated employee not in her protected class was treated more favorably.  *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 979 (7th Cir. 2014).  The "burden of establishing a prima facie case of disparate treatment is not onerous."  *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  It requires a plaintiff to show that she was "rejected under circumstances which give rise to an inference of unlawful discrimination," and

the "standard is not inflexible" because facts vary in different cases. *Burdine*, 450 U.S. at 253 and n.6. If plaintiff makes out a *prima facie* case of sex or race discrimination, defendant has the light burden of *articulating* a legitimate, non-discriminatory reason for the adverse action. *Alexander*, 739 F.3d at 979. If defendant does so, plaintiff has the burden to show that the proffered reason was just a pretext for sex or race discrimination. *Id.* A pretext is a dishonest explanation, rather than an error. *See Bodenstab v. County of Cook*, 569 F.3d 651, 657 (7th Cir. 2009). To show pretext, House "must establish that the explanation is a lie, which permits a jury to infer that the tale has been concocted to conceal an unlawful truth. It is not enough to demonstrate that the employer was mistaken, inconsiderate, short-fused, or otherwise benighted; none of those possibilities violates federal law. Poor personnel management receives its comeuppance in the market rather than the courts." *Yindee v. CCH Inc.*, 458 F.3d 599, 602 (7th Cir. 2006) (internal citations omitted).

House clearly has put forth sufficient evidence of the first and third elements of a *prima facie* case. The evidence is undisputed that House is a member of two protected classes: she is female, and she is African American. It is also undisputed that House suffered an adverse employment action: S&C terminated her employment. The parties disagree about the other elements of the *prima facie* case. The Court will assume, without deciding, that House was meeting her employer's expectations (because she had gone a month without any discipline) at the time of the February 2, 2012 incident.

To make out a *prima facie* case of discrimination, House must also show that a similarly-situated individual outside of her protected class was treated more favorably. A similarly-situated individual is someone "whose performance, qualifications, and conduct are comparable

in 'all material respects.'" *Tank v. T-Mobile USA, Inc.*, 758 F.3d 800, 809 (7th Cir. 2014). House argues that Vandergriff, who was outside of both of her protected classes, was similarly-situated to her. In several respects, he was. Vandergriff and House had the same job, and the same person (Hattan) had the authority to discharge them. Both Vandergriff and House were involved in the February 2, 2012 domestic altercation (although the undisputed evidence is that Hattan found House's version of the events not to be credible).

As defendant points, out, however, one dispositive difference separated House from Vandergriff. Six weeks before the February 2, 2012 incident, House, unlike Vandergriff, had been put on a Decision-Making Day Corrective Action. At S&C, a Decision-Making Day Corrective Action is essentially a last chance agreement, and it lasts one year. House was on one, but Vandergriff was not. Thus, as a matter of law, House and Vandergriff were not similarly-situated. *Steinhauer v. Degolier*, 359 F.3d 481, 484-85 (7th Cir. 2004) ("However, [employee] and [plaintiff] were not similarly situated because [plaintiff] was still on probation while [employee] was not."); *Smith v. Waste Mgt. of Ill., Inc.*, Case No. 05-1284, 2008 WL 2078064 at *9 (C.D. Ill. May 15, 2008) ("[T]o be similarly situated to [plaintiff], the other employees must have been terminated for having an accident after having been placed on a last chance agreement. [Plaintiff] has not identified any younger driver who was not terminated for having an accident while on a last chance agreement and has therefore failed to establish the fourth element of his prima facie case."); *Dorado v. The Dial Corp.*, Case No. 05 C 5627, 2007 WL 1052499 at *5 (N.D. Ill. April 5, 2007) (plaintiff failed to make out *prima facie* case where only plaintiff was subject to "stricter standards of a Last Chance Agreement.").

Because plaintiff has failed to make out a *prima facie* case of race or sex discrimination, defendant is entitled to judgment as a matter of law. *Kriescher v. Fox Hills Golf Resort & Conf. Ctr.*, 384 F.3d 912, 915 (7th Cir. 2004) (evidence of a similarly-situated individual is an essential element of the *prima facie* case, and, without it, defendant is entitled to judgment as a matter of law on a plaintiff's discrimination claim). The Court grants defendant's motion for summary judgment.

## IV. <u>Conclusion</u>

For the reasons set forth above, the Court grants defendant's motion for summary judgment. Case closed. The Court thanks plaintiff's appointed attorneys for their service in this case.

ENTER:

/s/ George M. Marovich

George M. Marovich
United States District Judge

DATED: April 7, 2015